

```
1              Q & A of:  PETER WELKLEY
2   STATE OF NEW YORK
3   DEPARTMENT OF CORRECTIONS
4   AND COMMUNITY SUPERVISION
5   *********************************************
6              In the Matter
7                - of -
8           Case Number IAD/16/0444
9   *********************************************
10       TRANSCRIPT OF PROCEEDINGS held in the
11   above-entitled matter on the 12th day of
12   April, 2016, commencing at 11:15 a.m. and
13   ending at 11:52 a.m., at the Electric Tower,
14   535 Washington Street, Suite 304, Buffalo, New
15   York, before LINDSAY N. ROBEL, a Shorthand
16   Reporter and Notary Public within and for the
17   State of New York.
18
19
20
21
22
23
```

1        A P P E A R A N C E S:

2

         FOR THE INSPECTOR GENERAL'S OFFICE:
3
         **KEVIN RYAN,** Assistant Deputy Chief
4        Office of Special Investigations

5        **CHRIS TIRADO,** Investigator

6
         FOR THE WITNESS:
7
         **ERIC SOEHNLEIN,** Lippes Mathias Wexler &
8        Friedman

9        **ED RICE,** Orleans Chief Sector Steward

10       **JOE MIANO,** Western Region Vice President

11       **KENNY GOLD,** Western Region Support Staff

12

13

14

15

16

17

18

19

20

21

22

23

1          (Exhibit 1, e-mail March 15th, 2016; Exhibit

2     2, e-mail March 15, 2016 9:49 a.m., were

3     marked for identification)

4

5          P E T E R   W E L K L E Y,

6     having been first duly sworn, was examined and

7     testified as follows:

8

9          MR. TIRADO:  Officer Welkley, you've

10    been called here today by the Office of

11    Special Investigations as part of an ongoing

12    investigation today.  Before we get started

13    today, I'm going to give you a copy of

14    Directive 0102, which outlines your rights as

15    a departmental employee.  If you can just

16    review and verbally state when you understand

17    your rights.

18          MR. SOEHNLEIN:  As counsel to Officer

19    Welkley, I'll represent that we've reviewed

20    the sum and substance of 0102 prior to today's

21    interrogation.  The officer understands he's

22    here for a compelled interrogation and has a

23    duty to tell the truth.  We will request a

1    copy of the transcript once it's been

2    prepared.

3       Officer, do you understand the sum and

4    substance of 0102?

5       THE WITNESS:  Yes, I do:

6       MR. SOEHNLEIN:  Thank you.

7

8    EXAMINATION BY MR. TIRADO:

9    Q. Officer Welkley, how long have you been

10   employed by the Department of Corrections?

11   A. My seniority date is 12/5/94.  I've been in

12   almost 21 and a half years.

13   Q. Okay.  And in those 21 years, what facilities

14   have you worked at?

15   A. I worked at Sing Sing, Bedford Hills, Cayuga,

16   Albion, Orleans.

17   Q. Okay.  And how long have you been a

18   correctional officer at Orleans?

19   A. I believe I got there in the winter of '98.

20   Q. Okay.  And do you have a current job bid?

21   A. Yes, I do.

22   Q. Okay.  And what bid is that?

23   A. It's called garden squad.

```
 1    Q.  Okay.  Can you -- what shift is that?
 2    A.  Seven to three.
 3    Q.  Okay.  Can you explain your duties?
 4    A.  It's got different duties.  In the summer, my
 5        job is I have a crew.  We have a garden there.
 6        We take care of the garden.  We mow the lawns.
 7        In the winter, we remove the snow from the
 8        inner facility and on the weekends and
 9        holidays we're in the visit room.
10    Q.  Okay.  And how long have you held that bid
11        for?
12    A.  About five years.
13    Q.  Okay.  So that's just weekends and holidays
14        you're in the visit room?
15    A.  Yes.
16    Q.  Okay.  Do you work with any regular correction
17        officers as partners?
18    A.  Yes, I do.
19    Q.  Okay.  Who's that?
20    A.  The lawns and grounds crew is David Wells.
21        The garbage man is Al Tuskus and the relief
22        for the three is Cedrick Soria.
23    Q.  Okay.  Officer Soria, so that means he's also
```

```
 1          the visit room relief also?
 2     A.   Yes.
 3     Q.   Doing one of those three jobs?
 4     A.   That's correct.
 5     Q.   Okay.  So what we're here to talk to you about
 6          today is some situations related to an inmate,
 7          George Wishart.  Are you aware who Inmate
 8          George Wishart is?
 9     A.   Yes.
10     Q.   You are?  Okay.  How do you know him?
11     A.   I know him from the visit room.  He used to
12          have a visitor come in and visit him.  That's
13          all I know about him.
14     Q.   Okay.  Have you ever worked in a dorm that
15          Inmate Wishart lived on?
16     A.   No, I don't work dorms.
17     Q.   Okay.
18     A.   I was -- I don't recall what dorm he was on,
19          but when the jail was locked down, we frisked
20          different dorms.  So I believe he was on one,
21          yes.
22     Q.   Okay.  And when the jail was locked down, you
23          were one of the frisking officers?
```

```
1     A. Yes.  I frisked in several dorms, yeah.

2     Q. Okay.  Did you frisk in C-2 dorm?

3     A. C-2 I reported to frisk in the morning and I

4        was there for a bit and got called off earlier

5        in the morning to go to the store house to

6        relieve an inmate -- or an officer who was

7        sick and going home.

8            MR. RYAN:  Reference the date.

9     BY MR. TIRADO:

10    Q. The date of the frisk, which was?

11    A. I believe that was the 16th of March.

12    Q. Okay.  On that date, did you have any

13       interactions with Inmate Wishart?

14    A. No, I did not.

15           MR. TIRADO:  Okay.

16           MR. RICE:  The date of the frisk wasn't

17       the 16th.

18           MR. TIRADO:  Okay.

19           MR. GOLD:  It was either the 14th or the

20       15th.  The weekend was over by the 16th.

21           MR. TIRADO:  Oh, okay.

22           THE WITNESS:  I'm sorry.

23           MR. TIRADO:  Actually, the frisk date
```

```
1         would have been 14th.
2                 MR. RICE:  Just clarifying.
3                 THE WITNESS:  I'm sorry.
4                 MR. TIRADO:  Thank you, Sergeant Rice.
5         BY MR. TIRADO:
6     Q.  And you said you had no interaction with
7         Inmate Wishart that day?
8     A.  No, I didn't.
9     Q.  Okay.  So what times have you had interactions
10        with Inmate Wishart?
11    A.  The only interaction I ever had with him was
12        in the visit room.  I frisked him out one
13        time.  Sometimes my duties called me to help
14        frisk in the -- back in one time I helped
15        frisk him out.
16    Q.  Okay.  Was there any personal interaction
17        between you two during that frisk?
18    A.  No, none.
19    Q.  Okay.  As part of your duties as a visit room
20        officer, do you walk the visit room?
21    A.  Yes, I do.
22    Q.  Okay.  Do you interact with inmates that are
23        on visits?
```

103

```
1    A.  Sometimes.  My interaction with my job is to
2        sit in the seat generally, watch for, you
3        know, any undue sexual activity or passing of
4        contraband, if something goes on, yes.
5    Q.  So on a normal weekend, how many officers
6        would actually be working the visit room?
7    A.  There's two at the front desk, two in back
8        chairs and a frisk officer.
9    Q.  Okay.  And where would you normally be working
10       on those four jobs?
11   A.  I am in the back.
12   Q.  At the chair?
13   A.  At a chair, yes.
14   Q.  Okay.  And you said you do walk around and
15       interact with inmates?
16   A.  If -- yeah, I mean, you know, I've been in the
17       jail a long time.  An inmate might say hi to
18       me.  I may say hi to them.  Other than that,
19       if there's, you know, something going on, I'll
20       have to have interaction with them, but yes.
21   Q.  Okay.  Do you interact with inmates' visitors?
22   A.  Occasionally they'll say hello, you know, and
23       talk to me, yeah.
```

```
 1    Q.  Okay.  Have you ever interacted with any of
 2        Inmate Wishhart's visitors?
 3    A.  Yes.
 4    Q.  Okay.  And do you know who that is?
 5    A.  I know what her name is now.  I believe it's
 6        ████████  ████████.
 7    Q.  Okay.  And who is she to Inmate Wishart?
 8    A.  As far as I knew, he was a friend from high
 9        school that she knew from high school and she
10        was visiting as a friend.
11    Q.  Okay.  And how often would she visit?
12    A.  As far as I recollect, she was fairly steady,
13        but she would miss some weeks, but fairly
14        steady, I believe.
15    Q.  Okay.  And I mean, how often would you
16        interact with her?
17    A.  Well, it depends on, you know, generally where
18        they are seated in the visit room, if someone
19        is seated next to my chair, because the tables
20        are fairly close to my chair.  If they're
21        waiting for their visitor, you know, they
22        might say hello.  They might, you know, strike
23        up a little conversation.  But other than
```

```
 1        that, really nothing.
 2    Q.  Would you say you would go out of your way to
 3        speak to ████ ████ than any other inmate
 4        visitor?
 5    A.  No.
 6    Q.  No?
 7    A.  No.
 8    Q.  Okay.  And when you did interact with Ms.
 9        Foley, what was the exchanges?
10    A.  Just, you know, friendly conversation.
11        Basically she would tell me, you know, what
12        her situation was at home.  You know, they
13        strike up conversation.  You know, and while
14        I'm looking, she might be sitting there, you
15        know, while I'm doing the visit room.
16            They might say, oh, geez, it was such a
17        long ride.  And, you know, if they take a long
18        time to get down there, she'd be saying oh,
19        what am I doing, you know, the guy is taking
20        forever to get down here.  Just, you know,
21        general things.
22    Q.  Okay.  Did the conversations between you and
23        ████ ████ ever turn personal?
```

1    A. Personal as far as?

2    Q. Either you or ████  ████ divulging personal

3       information to each other.

4    A. She would divulge information as far as she

5       had a couple of kids and she had gotten

6       divorced a couple years ago and her mom

7       watched the kids while she was here, you know,

8       just general things.  I never really, no.

9          MR. RYAN:  Now, you referenced that you

10      now know her name as ████  What did you

11      reference her as before?  When did you learn

12      that her name was ████ that you said now?

13         THE WITNESS:  Well, I knew her first

14      name from being in there because she

15      introduced herself, my name is ████  And I

16      didn't know her name until later obviously in

17      an e-mail.

18   BY MR. TIRADO:

19   Q. Now, you brought up e-mail.  Exactly how would

20      an e-mail exchange have started between you

21      two?

22   A. Like I said, there was friendly conversation

23      that she would tell me, you know, because it

1       just so happened the way the visit room

2       visitors were lined up, I was in my chair, she

3       was in a table near my chair, right near my

4       chair.  So while she was waiting for her

5       visit, she would tell me.  And one day she

6       said that she didn't think she was going to

7       visit him anymore because he was mean to her

8       and he took forever to come out.

9          And she asked me if I had an e-mail

10      address.  I said yes.  And she -- there was --

11      she got up.  There was a piece of paper on a

12      shelf near my chair and wrote her e-mail

13      address down.

14   Q.  Okay.  What did you do with that information?

15   A.  I kept the e-mail address that she gave me.  I

16      knew it was wrong.  I know it was wrong, but I

17      kept the e-mail address.

18   Q.  Okay.  Did you notify a supervisor or the

19      watch commander that a visitor had given you a

20      personal e-mail address?

21   A.  No, I did not.

22        MR. TIRADO:  Okay.

23

105

```
1          BY MR. RYAN:

2      Q. Just to be unclear, unprompted she gave you

3          her e-mail dress?

4      A. Yes.  I mean, there was -- like I said, the

5          kind of conversation I said she would tell me

6          her kids, whatever.  And she said basically

7          oh, you know, I don't know if I'm visiting

8          this guy.  You know, geez, you're nice and

9          wrote her e-mail down.  And she asked me if I

10         had an e-mail address.  I said yes, and she

11         wrote her e-mail address down.

12     Q. So you exchanged e-mail addresses?

13     A. No.  I never gave her mine.  She gave her --

14         or she gave me hers.

15     Q. Phone numbers?

16     A. No.

17     Q. Home addresses?

18     A. No.

19     Q. Names?

20     A. No, I didn't find out her last name until it

21         was on an e-mail.

22     Q. Thank you.

23     A. You're welcome.
```

```
 1      Q. I mean, were you surprised that this
 2         interaction between you two was taking such a
 3         personal turn?
 4      A. Yeah.  I mean, it was friendly.  You know, was
 5         I surprised she came up and gave an e-mail,
 6         yes, I was.
 7      Q. Okay.  So the only communication you guys have
 8         had outside of speaking in the visit room was
 9         through e-mail?
10      A. Yes.
11      Q. Okay.  Who initiated that -- those
12         conversations?
13      A. I did.
14      Q. Okay.  But if she gave you her e-mail, how are
15         you initiating the conversation without having
16         her e-mail?  Oh, you initiated.  Oh, I'm
17         sorry.  I reversed that.
18      A. Yeah, I e-mailed her.
19      Q. You e-mailed her first?
20      A. Yes, I did.
21      Q. And what did those e-mails consist of?
22      A. The first e-mail I e-mailed, I believe --
23              MR. TIRADO:  You know what, I already
```

1          had these entered as 1 and 2.

2                  MR. SOEHNLEIN:  Yeah, why don't we let

3          him see them.

4                  MR. TIRADO:  1 and 2, there's two pages.

5          Take a minute and review it.

6                  MR. SOEHNLEIN:  Yeah, review every word.

7                  MR. GOLD:  What do you have them entered

8          into the record as?

9                  MR. SOEHNLEIN:  1 and 2.

10                 MR. TIRADO:  Just 1 and 2.

11                 MR. SOEHNLEIN:  All right.  You got it?

12                 THE WITNESS:  Yeah.  But it's -- they're

13         not correct.

14                 MR. SOEHNLEIN:  Well, what's not correct

15         about this?

16                 THE WITNESS:  I don't -- first of all,

17         the -- I'm not sure about the dates.  I don't

18         think the dates are correct.

19                 MR. SOEHNLEIN:  Okay.  Can I just have a

20         second?

21

22                      (A short recess was taken)

23

1      MR. SOEHNLEIN:  I want to thank the

2    investigators for giving us a brief recess off

3    the record.  In speaking with Exhibits 1 and 2

4    with Officer Welkley, he acknowledges that

5    they're an accurate reflection of his e-mail

6    address and the e-mail address that he sent

7    communications to.  And generally speaking,

8    it's an accurate and true snapshot of the

9    communications.

10      However, in reviewing Exhibit 1 in

11    particular, he doesn't believe that the dates

12    are accurate and there's also an e-mail that

13    is midway down the page, that's quote, "Where

14    you been girl???", that he does not believe he

15    sent.  Obviously, we understand that your

16    office has a subpoena out to Google and you

17    know obviously we're not opposing that

18    subpoena.  We'll do everything that we can to

19    assist in cooperating getting a fulsome and

20    accurate reflection of the e-mails.

21      But we just wanted to note at this time

22    that we don't believe that those are accurate

23    with respect to these documents, but he does

1        acknowledge that e-mail communication existed,

2        and so he's prepared to answer questions with

3        respect to these, but just understanding those

4        reservations.

5            MR. RYAN:  Given that he's -- has a

6        different recollection of these questions or

7        the representations on these e-mails, would

8        you consent to a search of your home computer?

9            MR. SOEHNLEIN:  Let's just talk.

10           MR. MIANO:  Talk for a second.

11

12           (A short recess was taken)

13

14           MR. SOEHNLEIN:  We can go back on.  On

15       behalf of Officer Welkley, the investigators

16       and I have engaged in conversation off the

17       record.  We acknowledge that there is

18       presently a subpoena out to Google for the

19       officer's -- a complete copy of the officer's

20       e-mail.  We acknowledge that whatever that

21       production is from Google will be a fair and

22       accurate reflection of the e-mails and

23       particularly the e-mails at issue in this

```
1          case.  We are not opposing that subpoena.
2               And so in light of that, I think we've
3          agreed that a search of the officer's personal
4          computer is not likely to yield any additional
5          relevant evidence at this time, and so it's
6          unnecessary.
7
8          BY MR. TIRADO:
9      Q.  So, Officer Welkley, you've acknowledged that
10         these e-mails exchanges are accurate minus the
11         February 26th "where you been girl"?
12     A.  To the best of my knowledge, yes.
13              MR. TIRADO:  Okay.
14              MR. GOLD:  And the dates.
15              THE WITNESS:  Yeah.
16         BY MR. TIRADO:
17     Q.  And the dates?
18     A.  Correct.
19     Q.  Okay.  So you stated earlier that after being
20         given the e-mail address by Ms. ███████ you
21         initiated the conversation?
22     A.  Yes, I did.
23     Q.  Okay.  What was the purpose of initiating that
```

1           conversation?

2      A.  I mean, I was wrong, it was bad, judgment at

3           the spot, just being friendly, just -- I don't

4           know.  She -- you know, she seemed down in the

5           dumps.  Just trying to make her feel better

6           about herself, I guess.

7      Q.  Okay.  And you felt those things after sending

8           the initial e-mail, that it was wrong?

9      A.  Well, after the last e-mail, I felt it was

10          wrong.  That's why I didn't e-mail anymore.

11              MR. TIRADO:  Okay.  I don't know if you

12          want me to put this in or not, but this is

13          inmate --

14              MR. RYAN:  Let me just --

15     BY MR. RYAN:

16     Q.  How many times did you e-mail?

17     A.  To the best of my knowledge, I e-mailed twice

18          on one day and once on another day.

19     Q.  Three times total?

20     A.  Correct.

21     Q.  And this is the only visitor that you've ever

22          exchanged e-mail with?

23     A.  Yes.  It's the only one and never again.

```
1              MR. RYAN:  Okay.

2              MR. TIRADO:  I was going to ask him some

3       questions regarding Inmate Wishhart's

4       grievance complaint related to this.  Do you

5       want me to enter this or can I ask him the

6       questions off the grievance?

7              MR. SOEHNLEIN:  Well, so if you want to

8       ask him if he's aware of it, if he's seen it,

9       things like that, that's fine.  If you're

10      going to ask him, you know, specifics about

11      the grievance --

12         Let me ask you this:  Are you aware of

13      this grievance?  Wishart.

14              THE WITNESS:  I am aware now, yes.

15              MR. SOEHNLEIN:  Okay.  You weren't aware

16      at the time it was made?

17              THE WITNESS:  No.

18              MR. SOEHNLEIN:  Have you ever reviewed

19      it?

20              THE WITNESS:  No, I haven't.

21              MR. SOEHNLEIN:  All right.  So why don't

22      we try it this way:  Why don't you ask him

23      what you want to, and then in the event that
```

```
 1       we need to enter it, you know, we will.   But
 2       obviously he doesn't have personal knowledge
 3       of the grievance or the content of it.
 4
 5       BY MR. TIRADO:
 6    Q. Did you ever submit a response to the
 7       grievance?
 8    A. No, I didn't know it existed, no.   Until
 9       after, no, I had no idea.
10    Q. How did you find out the grievance existed?
11    A. Talking to -- you know, after I was on
12       administrative leave, out, you know, officers
13       are calling me, you know, to be friendly
14       saying good luck and that and I did find out
15       in the process of that that, you know, he had
16       filed or was going to file a grievance,
17       something like that.
18    Q. Okay.   I mean, basically these are going to be
19       yes or no answers.
20    A. Okay.
21    Q. Through correspondence with ████████   Inmate
22       Wishart compiled this grievance of things that
23       she said transpired between the two of you in
```

1        the visit room at Orleans Correctional

2        Facility.

3            Have you ever told Ms. ███ that she

4        looked sexy in the visit room?

5    A.  No.

6    Q.  Okay.  Have you ever asked to take her to

7        lunch?

8    A.  No.

9    Q.  Have you ever questioned her for visiting an

10       inmate?

11   A.  No.  She would state that, you know, she

12       didn't know what she was doing, she didn't

13       know if she was going to visit him.  It was

14       just a friend from high school.  I said you

15       have to -- you know, you've got a kid, you've

16       got a job, you've got to decide whether this

17       is right for you or not.

18            MR. TIRADO:  Okay.

19            MR. RYAN:  In reference to what; that

20       she shouldn't visit an inmate?

21            THE WITNESS:  Well, the fact that she

22       informed me that her 70-year-old mother had to

23       watch kids and she had to drive three hours to

1        visit a guy from high school, and that was

2        about it.

3               MR. RYAN:  Okay.  Thanks.

4

5        BY MR. TIRADO:

6    Q.  Did you ever imply to her you thought she was

7        too good to be visiting inmates?

8    A.  Not to my recollection, no.

9    Q.  Okay.  Have you ever noticed Ms. ███ not in

10       the visit room and approached another visitor

11       to ask if she was coming that day?

12   A.  No.

13   Q.  Or where she was?

14   A.  No.

15   Q.  Okay.  I'd like to go back to the 14th, which

16       was the day the facility was shut down and the

17       dorms were frisked.  You said you did frisk

18       some dorms but had no contact with Inmate

19       Wishart?

20   A.  Correct.

21   Q.  Okay.  Were you aware that Inmate Wishart was

22       taken to the SHU that day?

23   A.  After the fact I was aware, after I got off

169

```
 1           because I wasn't in the area, I wasn't around.
 2      Q.  Okay.  Were you aware that a response was
 3           called to C2 dorm?
 4      A.  Yes.
 5      Q.  Okay.  And you did not respond to that?
 6      A.  No, I didn't.
 7      Q.  Okay.  Are you aware if Officer Soria
 8           responded to that dorm?
 9      A.  I didn't -- I assume he responded.  He was at
10           the frisk area when I left, so...
11      Q.  Okay.  Is Officer Soria aware of the
12           situation, the e-mail exchanges between
13           yourself and Ms. ▮▮▮▮▮
14               MR. SOEHNLEIN:  At what point in time?
15           BY MR. TIRADO:
16      Q.  At any time.
17      A.  We have spoken afterwards and, you know, in
18           the conversation after I was locked out or --
19           well, on administrative leave, yes, because he
20           inquired and I told him.
21      Q.  Okay.  So the date of Inmate Wishart's SHU
22           admission, which was March 14th, on that day
23           was Officer Soria aware of the personal
```

```
1          exchange between you and Ms. Foley?
2     A.   No, he was not.
3     Q.   Okay.  Are you aware that Officer Soria was
4          personally involved in the incident with
5          Inmate Wishart and co-signed his misbehavior
6          report?
7     A.   I -- after speaking to him after I was out, he
8          said that, yes, he was involved with a removal
9          of this inmate.
10    Q.   And is that at that time you informed him of
11         the situation with Ms. ████?
12    A.   No, I believe it was before that, because he
13         -- you know, they asked me what was going on
14         and I said I e-mailed this visitor and that
15         was it.
16              MR. TIRADO:  Okay.
17
18         BY MR. RYAN:
19    Q.   The inmate, Wishart, had gone through informal
20         channels to try to resolve this prior to
21         filing a grievance or contemplating the
22         grievance or his later assault on 3/14.  The
23         last e-mail - and I know the dates are in
```

1    question - were the end of February and then

2    we have about a three-week period where the

3    frisk occurs.

4         The inmate indicated to us that he had

5    gone to other corrections officers and tried

6    to informally resolve this issue with you.

7    Your testimony now is you were not aware of

8    that?

9    A. No, I was not aware of.

10   Q. Okay.  Thank you.  Would any other officers

11      know of your interaction with the inmate's

12      visitor?

13   A. No.

14   Q. Did you share that information?

15   A. No, with no one.

16   Q. So on 3/14, when the facility is under a

17      frisk, there's a two-man fight in the dorm

18      that Inmate Wishart is in.  Did you respond to

19      that two-man fight?

20   A. No, I didn't.

21   Q. Twenty officers responded.  You were not one

22      of them?

23   A. No, I was not in that area.

122

```
 1      Q. Okay.  Where were you?
 2      A. I was in the storehouse.
 3      Q. Okay.
 4            MR. GOLD:  He talked about that earlier.
 5         He said where he was.
 6            MR. RYAN:  Thank you.
 7         BY MR. RYAN:
 8      Q. What time -- are you aware of what time the
 9         fight occurred?
10      A. No, I'm not aware.
11      Q. Okay.  The fight occurred approximately 10:30
12         to 11 a.m.
13      A. Okay.
14      Q. And your testimony is you were in the
15         storehouse at that time?
16      A. Yes, I was.
17      Q. What were you doing?
18      A. An officer had gotten sick earlier that was
19         watching the storehouse because we had --
20         you've got inmates working in the storehouse
21         with the storehouse civilians and she went
22         home sick.  I relieved her and watched the
23         inmates and, you know, security over there.
```

```
1              MR. RYAN:   Okay.

2

3         BY MR. TIRADO:

4      Q. Were you aware at any point if Ms. ███████

5         informed Inmate Wishart that there was an

6         exchange between you two through e-mail?

7      A. No.

8      Q. You're not sure?

9      A. No, I had no idea that he had any knowledge of

10        it.

11     Q. Okay, okay.  You do understand that that

12        brings a high level of a security risk to the

13        facility particularly for yourself, if that --

14        if an inmate obtains that knowledge and what

15        his reaction might be is very unpredictable;

16        do you understand what I'm trying to say to

17        you?

18     A. Yes, I understand.

19     Q. You put yourself in a very dangerous position

20        is what I'm saying.  Humans in general can be

21        very unpredictable.  So what Inmate Wishart

22        could have or may have done in a reaction to

23        finding out that there was a personal exchange
```

12c

```
 1          between you and whatever they were as far as
 2          title, it could have been a very dangerous
 3          spot for yourself or maybe other officers.
 4     A.   What I did was wrong.  E-mailing this woman
 5          was wrong.  I agree with that.
 6     Q.   So, I mean, looking back now, would you have
 7          done anything different?
 8     A.   Of course.  I would have never taken her
 9          e-mail address.  I would have never e-mailed
10          her, of course.
11
12          BY MR. RYAN:
13     Q.   The question that remains outstanding - and I
14          appreciate your candor and your error in
15          judgment and, you know, it's unfortunate, but
16          it is what it is - but the question that still
17          remains outstanding is:  Soon after the
18          incident in the C-2 dorm, Inmate Wishart was
19          interviewed by Investigator Tirado.  And one
20          of his initial statements to Investigator
21          Tirado was that this assault occurred because
22          of your conduct with his visitor.
23               He was assaulted in his view by other
```

```
 1        correction officers; meaning, that he was

 2        aware and made that concern to other

 3        corrections officers and that you were aware

 4        of the fact that this had occurred; meaning,

 5        other correction officers knew of your

 6        interaction with his visitor.

 7   A.  Well --

 8            MR. SOEHNLEIN:  There's not a question.

 9        Wait for a question.

10   Q.  Again, Officer -- Inmate Wishart contends that

11        he was assaulted because of this interaction.

12            MR. GOLD:  Allegedly.

13   Q.  Did you share that information with any other

14        correction officers?

15   A.  No, I didn't.

16            MR. RYAN:  Okay.  Thank you.

17            THE WITNESS:  You're welcome.

18            MR. TIRADO:  All right.  Can we take one

19        second?

20            MR. SOEHNLEIN:  Yeah, of course.

21

22            (A short recess was taken)

23
```

1            MR. TIRADO:   Back on.   At this time, we

2       would like to conclude.   We don't have any

3       further questions.

4            Officer Welkley, is there anything you

5       would like to add before we conclude here?

6            THE WITNESS:   No, just that I was wrong

7       in the e-mails and that's it.

8            MR. TIRADO:   Okay.   Thank you.

9            THE WITNESS:   Thank you.

10

11            (Concluded at 11:52 a.m.)

12                 *  *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

127

```
1        STATE OF NEW YORK)

2                    )  ss.

3        COUNTY OF ERIE    )

4

5         I, Lindsay Nicole Robel, Notary Public, in
         and for the County of Erie, State of New York,
6        do hereby certify:

7         That the witness whose testimony appears
         hereinbefore was, before the commencement of
8        their testimony, duly sworn to testify the
         truth, the whole truth and nothing but the
9        truth; that said testimony was taken pursuant
         to notice at the time and place as herein set
10       forth; that said testimony was taken down by
         me and thereafter transcribed into
11       typewriting, and I hereby certify the
         foregoing testimony is a full, true and
12       correct transcription of my shorthand notes so
         taken.

13        I further certify that I am neither counsel
         for nor related to any party to said action,
14       nor in any way interested in the outcome
         thereof.

15

16        IN WITNESS WHEREOF, I have hereunto
         subscribed my name and affixed my seal this
17       26th day of __April_____, 2016.

18              Lindsay Robel
                _____
19              Lindsay Nicole Robel
                Notary Public
20              No. 01TR6249119
                State of New York, County of Erie
21              My Commission Expires 10/03/2020

22

23
```

**DEPAOLO-CROSBY REPORTING SERVICES, INC.**
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544