UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

GEORGE WISHART,

                          Plaintiff,

-against-

Correction Officer PETER WELKLEY (in his individual capacity), Correction Officer CEDRIK SORIA (in his individual capacity), Correction Officer JOSEPH SULLIVAN (in his individual capacity), Correction Officer W. MARYJANOWSKI (in his individual capacity), Correction Officer PAUL PALISTRANT (in his individual capacity), Correction Officer SWIATOWY (in his individual capacity), Correction Officer MITHADRILL (in his individual capacity), Correction Sgt. JAMES OPPERMAN (in his individual capacity), Correction Sgt. EDWARD RICE (in his individual capacity), and Correction Lt. BRIGHT (in his individual capacity).

                          Defendants.

------------------------------------------------------------------------X

No. 19 CV 6189 (MAT) (MWP)

**DECLARATION OF JOSHUA S. MOSKOVITZ IN SUPPORT OF PLAINTIFF'S FEE APPLICATION**

      JOSHUA S. MOSKOVITZ, an attorney duly admitted to practice before this Court, declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

      1.     Along with Rob Rickner of Rickner PLLC, I represent the plaintiff, George Wishart, in this civil rights action. I submit this declaration pursuant to the Court's August 26, 2020, Decision & Order (ECF No. 49) ("the August Order") granting Plaintiff's motion for sanctions against Defendants for their failure to comply with the Court's February 6, 2020, and April 16, 2020, Orders (ECF No. 40). The August Order directed Plaintiff's counsel to "file proof of the reasonable costs incurred for moving to sanction defense counsel, and the cost of orally arguing the issue" (ECF No. 49 at 2).

**I.     Background**

2.     Plaintiff's motion for sanctions arose from Defendants' repeated failure to comply with the Court's order "to provide the following information for *in camera* review: 'For any defendants who left employment at DOCCS prior to attaining thirty years of service and thus maximizing their benefits, the reason for the defendant's departure'" (ECF No. 49 at 1-2 (quoting ECF No. 25 and ECF No. 36)).

3.     The Court first directed Defendants to provide this information on February 3, 2020 (ECF No. 25 at 3) ("the February Order").  Defendants did not comply.  Instead, they submitted an *ex parte* argument to modify the Court's February Order.  On March 17, 2020, the Court modified its February Order based on Defendants' *ex parte* argument (ECF No. 32 at 1-2 n.1) ("the March Order").  At the same time, the Court's March Order noted that Defendants had not complied with the Court's February Order and directed Defendants to do so by April 17, 2020 (ECF No. 32 at 3).

4.     Having discovered in the March Order that Defendants submitted an *ex parte* argument, Plaintiff filed a motion on March 20, 2020 (ECF No. 33).  That motion (1) asked the Court to direct defense counsel to provide Plaintiff's counsel with a copy of the *ex parte* letter; (2) explained the inaccuracy of defense counsel's *ex parte* argument; and (3) apprised the Court of Defendants' on-going failure to collect their ESI as directed by the Court.  Defendants did not respond to Plaintiff's motion.

5.     By Order dated April 16, 2020, the Court explained that "[i]n its March 17, 2020 Order, the Court noted that Defendants had not complied with the Court's February 3, 2020, Order" (ECF No. 36 at 1-2) ("the April Order").  The April Order also explained that the Court had modified its February Order on the basis of defense counsel's *ex parte* argument because,

2

"[u]nnoticed by the Court was the lack of a notation that the letter was copied to Plaintiff's counsel" (ECF No. 36 at 3). Accordingly, the Court directed defense counsel to provide Plaintiff's counsel with a copy of the *ex parte* communication. The Court also held:

> [B]ecause the Court now has the benefit of Plaintiff's counsel's research regarding the years necessary for a corrections officer to reach his full retirement benefits, the original 30-year period should stand. Thus, the Court will rescind its direction in its March 17 Decision and Order, footnote 1, and direct defense counsel to answer the original question with the 30-year period, by April 30, 2020, *in camera* if necessary (ECF No. 36 at 3).

6. Defendants' counsel did not respond by April 30 as ordered. Instead, on May 1, 2020, defense counsel sent a letter to the Court that again failed to provide the required information. That same day, the Court directed Plaintiff's counsel to respond to defense counsel's letter.

7. On May 4, 2020, Plaintiff submitted his response (ECF No. 40). Plaintiff described the facts as set forth herein and asked the Court to issue an order, "directing Defendants to provide the required information and documents within two business days and directing Defendants to pay Plaintiff's attorney's fees and costs in connection with this letter and Plaintiff's March 20, 2020 letter" (ECF No. 40 at 3).

8. On May 12, 2020, Defendants' counsel submitted a sworn declaration opposing Plaintiff's motion for sanctions, arguing that "[t]he Court's order has been complied with in its entirety" and asserting that Plaintiff's motion for sanctions "is frivolous and moot *ad ibnitio*" (ECF No. 43-1 at 1-2).

9. Despite this sworn assertion that Defendants had complied with the Court's April Order "in its entirety," Defendants had not, in fact, complied with the Court's order in two respects. First, as the Court later concluded, *see infra* ¶ 12, Defendants had not complied with the portion of the Court's April Order directing Defendants to produce information pertaining to the

3

defendants who left DOCCS employment before 30 years of service. Second, as we discovered last week during the parties' meet-and-confer with Defendants' counsel and their in-house ESI expert, Defendants have *still* not collected their ESI from an email account, cell phone, and certain social media data – even though Defendants' counsel represented to us and told the Court that this data had been collected already.

10. On May 13, 2020, the undersigned submitted a declaration in reply to Defendants' opposition and in further support of Plaintiff's motion for sanctions (ECF No. 44).

11. The Court held oral argument on this motion and other pending motions on August 18, 2020 (ECF No. 49 at 1).

12. By Decision & Order dated August 26, 2020, the Court granted Plaintiff's motion for sanctions. The Court noted that "[a]s defense counsel had not complied as of the oral argument date, the Court grants Plaintiff's application" (ECF No. 49 at 2). Accordingly, the Court directed "Plaintiff's counsel [to] file proof of the reasonable costs incurred for moving to sanction defense counsel, and the cost of orally arguing the issue."

**II.     Reasonable expenses**

13. The expenses Plaintiff reasonably incurred as a result of Defendants' and defense counsel's repeated failures to comply with the Court's orders include attorney's fees for the work of Mr. Rickner and myself in connection with the following:

   a. reviewing the Court's March Order modifying its February Order and researching, preparing, and submitting the necessary papers concerning defense counsel's *ex parte* argument to modify the February Order (ECF No. 33);

   b. reviewing the Court's April Order and defense counsel's belated response to that Order;

      c. researching and preparing a response to defense counsel's May 1, 2020 letter, as directed by the Court, which included seeking sanctions (ECF No. 40);

      d. reviewing defense counsel's opposition to Plaintiff's motion for sanctions;

      e. preparing a reply to Defendants' opposition (ECF No. 44);

      f. preparing for and participating in oral argument on August 18, 2020; and

      g. preparing and submitting this fee application.

    14. Attached hereto as Exhibit 1 are excerpts of the undersigned's contemporaneous time records for above work, reflecting a total of 23½ hours. These hours are reasonable and were necessary to litigate this issue. Defendants and their counsel have repeatedly resisted providing discovery, including court-ordered discovery, throughout this case, and have provided false representations, under oath, about the status of discovery that has been completed. This has caused substantial delay.

    15. The issue at bar stems from the Court's Order of February 3, 2020. As of August 18, 2020, Defendants had still not complied with that order to provide basic information – and even now, Defendants have not fully complied with the Court's order concerning these matters (*see* ECF No. 52). The actions of Defendants and their counsel have multiplied these proceedings and the work required of Plaintiff's counsel, and Plaintiff's legal fees, in order to obtain this necessary discovery.

    16. My present hourly rate is $475 per hour. As discussed in more detail in the accompanying memorandum of law, this is a reasonable rate in the Southern District of New York based on (a) my qualifications and expertise in civil rights matters, (b) the hourly rate paid by my retained clients, (c) the hourly rate defendants in other fee-shifting cases have agreed to pay for my work, and (d) reasonable market rates in the Southern District of New York.

### a. My experience

17. I was first admitted to practice law in New York in July 2011. I am also admitted to practice in the United States Courts of Appeals for the Second, Third, Fifth, and D.C. Circuits, and in all four United States District Courts of New York. I have also been admitted *pro hac vice* in the United States District Court for the District of New Jersey.

18. I graduated from the Benjamin N. Cardozo School of Law *summa cum laude* in 2010. I graduated Order of the Coif and received the highest honor in my graduating class, the Felix Frankfurter Award. During law school, among other things, I was an Articles Editor for the *Cardozo Law Review* and I practiced in New York state criminal courts under a practice order as part of the Cardozo Criminal Appeals and Criminal Defense Clinics.

19. In connection with the Cardozo Appeals Clinic, I authored the appellant's briefs in *People v. Taylor*, 15 N.Y.3d 518 (2010), which reversed the defendant's depraved indifference murder conviction. As part of the Cardozo Criminal Defense Clinic, I was lead counsel in pre-trial hearings and co-counseled a jury trial resulting in a not-guilty verdict for our client.

20. Following law school, I spent two years clerking for Judge James L. Dennis on the United States Court of Appeals for the Fifth Circuit, and assisted in preparing dozens of majority and dissenting opinions.

21. After completing my clerkship, I was hired at the firm Beldock Levine & Hoffman, LLP, where I gained substantial experience in civil rights litigation. I worked extensively with legendary civil rights attorney Myron Beldock on numerous cases, including *Greene v. City of New York*, No. 08-cv-243 (AMD) (CLP), in which I successfully argued for leave to take the deposition of former Kings County District Attorney Charles J. Hynes, which I took. I also worked extensively with Jonathan C. Moore, a leading civil rights attorney, on numerous cases including the Eric Garner

6

case. I worked closely with Mr. Moore in negotiating a pre-litigation settlement for Mr. Garner's family that was the largest settlement in a wrongful death case involving NYPD officers at that time. *See* Exhibit 2 (Declaration of Jonathan C. Moore, dated Sept. 18, 2020).

22. At the Beldock firm, I appeared as class counsel and had significant involvement in the stop-and-frisk litigation, *Floyd v. City of New York*, No. 08-cv-1034 (S.D.N.Y.). I also appeared as class counsel in the 2004 Republic National Convention mass arrest litigation, *MacNamara v. City of New York*, No. 04-cv-9216 (S.D.N.Y.), and as counsel for four of the five plaintiffs in the "Central Park Five" civil litigation, *In re McRay, Richardson, Santana, Wise and Salaam Litigation*, No. 03-cv-9685 (S.D.N.Y.). I was lead counsel in an emergency hearing in *Syed v. City of New York*, No. 16-cv-4789 (S.D.N.Y.), in which we secured a temporary restraining order that led to the NYPD rescinding its "no beard" policy.[1] I was also lead counsel in a jury trial before Judge George B. Daniels in the Southern District of New York.

23. In 2016, I started my own firm, Bernstein Clarke & Moskovitz PLLC, while maintaining an *of counsel* relationship with the Beldock firm. As a partner in my own practice, among many other matters, I was lead counsel in a Title VII discrimination case that was tried to a jury before Judge Joan M. Azrack in the Eastern District of New York. I was also lead counsel at an evidentiary hearing before Judge Jack B. Weinstein in the Eastern District of New York, *Zhang Jingrong* et al. *v. Chinese Anti-Cult World Alliance* et al., No. 15-cv-01046 (JBW) (VMS). Based on the record adduced at that hearing, Judge Weinstein granted in part the plaintiffs' motion for summary judgment,

---

[1] *See* Chris Fuchs, "Muslim Police Officer Sues NYPD Over Beard Ban," NBC News (June 23, 2016), *available at* https://www.nbcnews.com/news/asian-america/muslim-police-officer-sues-nypd-over-beard-ban-n597646.

and he later denied defendants' motion for summary judgment on the constitutionality of 18 U.S.C. § 248(b) following briefing and argument in which I was one of two lead counsel.[2]

24. Earlier this year, I started the Law Office of Joshua Moskovitz, where I am a sole practitioner. Stemming from work undertaken at my prior firm, my co-counsel Jason Leventhal and I recently reached a landmark $2.55 million settlement for our client, Karen Brown, arising from the death of her son in the custody of the NYPD. *See Brown v. City of New York* et al., No. 15-cv-4091 (S.D.N.Y.).

25. I am currently lead counsel on more than a dozen civil rights cases in state and federal court, primarily police misconduct and prisoner rights cases. Throughout my career, I have been lead-counsel on more than fifty civil rights cases, and I have appeared as co-counsel on another dozen civil rights cases in federal court.

26. In addition to my trial-level litigation practice, I have an important appellate practice. I have briefed appeals in the D.C. Circuit and have successfully briefed and argued appeals in the Second Circuit. This includes *Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015), which established constitutional law for the use of excessive force, and *Hughes v. City of New York*, 680 Fed. App'x 8 (2d Cir. 2017), which addressed a novel question of First Amendment law in light of the Supreme Court's decision in *Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016). I have also successfully argued appeals in state court, including *People v. Phillips*, 124 A.D.3d 493 (1st Dep't 2015), which led to a reduction in my client's sentence.

---

[2] *See* Andrew Denney, "Judge Sets Stage for Falun Gong's Religious Bias Case Against 'Anti-Cult' Group," *New York Law Journal* (April 23, 2018), *available at* https://www.law.com/newyorklawjournal/2018/04/23/judge-sets-stage-for-falun-gongs-religious-bias-case-against-anti-cult-group/; Andrew Denney, "Judge Upholds as Constitutional US Law Protecting Access to Religious Places," *New York Law Journal* (May 30, 2018), *available at* https://www.law.com/newyorklawjournal/2018/05/30/judge-upholds-as-constitutional-us-law-protecting-access-to-religious-places/.

27. I have published two scholarly articles. In 2010, I published *The Usual Practice: Raising and Deciding Failure to Exhaust Available Administrative Remedies as an Affirmative Defense Under the Prison Litigation Reform Act* in 31 Cardozo L. Rev. 1859 (2010). And in 2015, I published a chapter in Volume II of *Reentry Planning for Offenders with Mental Disorders: Policy and Practice* entitled "Expanding Access to Mental Health and Substance Abuse Services Through Parity Laws and the Affordable Care Act" (Henry A. Dlugacz, ed., Civic Research Institute 2015).

28. I have been invited to guest lecture on several occasions for the Benjamin N. Cardozo Law School Civil Rights Clinic. And in March 2015, I was asked to speak on a panel at a conference at Cardozo Law School entitled "Policing, Conflict, and Change."

29. I have been named by Super Lawyers as a Rising Star in the area of Civil Rights in the New York Metro Area each year since 2015.

    **b.**    **Hourly rates paid by my retained clients**

30. While my practice involves primarily contingency and fee-shifting matters, I have been retained by hourly-paying clients as well.

31. As a senior associate at the Beldock firm, my work was billed at an hourly rate of $400 per hour. *See* Ex. 2, at ¶ 9.

32. Since 2016, I have been paid a rate of $400 per hour by the plaintiffs in *Jingrong et al. v. Chinese Anti-Cult World Alliance* et al. No. 15-cv-01046 (E.D.N.Y.). While my hourly rate increased throughout my work on that case, I chose to continue billing my clients at a rate of $400 per hour.

33. In 2017, I was retained at a rate of $425 per hour to represent a client in proceedings to mitigate the collateral consequences of an old criminal conviction, as well as petitioning to obtain sealing of that conviction pursuant to New York's relatively new Criminal Procedure Law § 160.59.

9

34. I was retained last year by a client in a civil rights matter pending in the Southern District of New York at a rate of $500 per hour.

      **c.** **Hourly rates that defendants have agreed to pay in my other fee-shifting cases**

35. In 2018, in connection with my work as the plaintiff's counsel in *Pettiford v. City of New York*, No. 17-cv-5273 (E.D.N.Y.), I negotiated a fee with the City of New York that was based on a rate of essentially $400 per hour for my time on that case, which went back to 2017.

36. In 2019, in the *Floyd* litigation in the Southern District of New York, as part of the ongoing remedial work stemming from the post-trial injunction issued by the Court, which I continued to be actively involved in through my *of counsel* relationship with the Beldock firm, the City of New York agreed to a rate of $425 per hour for my work in 2017. *See* Ex. 2 at ¶ 10.

      **d.** **Reasonable rates in the Southern District of New York for attorneys of similar skill and experience.**

37. My office is located in the Southern District of New York and the majority of my legal practice takes place in that district.

38. In the years that I have practiced, which span nearly a decade now, through research and communications with colleagues and clients, I have developed an understanding of the common hourly rates for attorneys practicing in the Southern District of New York. My usual hourly rate for both paying clients and in my retainer agreements with contingency clients has been $475 per hour since 2019. This rate is consistent with the usual market rate for attorneys of similar skill and experience in the Southern District of New York.

39. Applying the loadstar method, *i.e.*, multiplying the 23.5 hours by my rate of $475 per hour, produces a reasonable fee of $11,305 in expenses Plaintiff incurred for the undersigned's work in connection with this issue.

**WHEREFORE**, I request the Court issue sanctions requiring Defendants and/or their counsel to pay Plaintiff's full costs in litigating this issue, including the costs associated with my work as described above, which totals $11,305.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
       September 23, 2020

_____
Joshua S. Moskovitz